IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CWTM CORPORATION d/b/a          §
C & W EXPORTS, L.C.,            §
                               §
        Plaintiff,             §
                               §
v.                             §        CIVIL ACTION NO. H-04-2857
                               §
AM GENERAL L.L.C. and          §
SCORPION, INC.,                §
                               §
        Defendants.            §

**ORDER ON PENDING MOTION, AND**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Order on Pending Motion

Defendant AM General, L.L.C., pursuant to Fed. R. Civ. P. 50, when Plaintiff rested its case and again at the close of all the evidence moved for judgment as a matter of law on all remaining claims asserted at trial by Plaintiff, which motion the Court reserved for a later ruling.  Having now fully considered the motion, it is

ORDERED that Defendant AM General's Motion for Judgment as a Matter of Law on Plaintiff's claims for promissory estoppel and unjust enrichment are GRANTED, and Defendant's Motion on Plaintiff's quantum meruit claim is DENIED.

### Findings of Fact

After all parties have rested and closed the evidence, and having heard and considered the arguments and authorities of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

### Agreed Findings of Fact

**The parties have mutually agreed to the following findings of fact, which the Court adopts:**

1.   Defendant AM General manufactures military vehicles, known as HUMVEEs, and related spare parts.

2.   AM General also manufactures civilian vehicles and related spare parts similar to its military vehicles.

3.   This lawsuit deals only with the manufacture and sale of military vehicles and spare parts.

4.   Not only does AM General sell its vehicles to the U.S. military but also to certain foreign militaries.

5.   One of these foreign militaries is Mexico's Secretaria de la Defensa Nacional ("SDN").

6.   Prior to 1989, AM General had not sold any military vehicles to the SDN.

7.   However, beginning that year, with the assistance of Plaintiff, AM General placed nearly 3000 vehicles into Mexico between 1989 and 1994.

8. In addition to this amount, AM General placed more than 300 vehicles into Mexico as foreign military sales, although Plaintiff does not take credit for those sales.

9. From 1989 to 2000, Plaintiff (or its predecessor companies) was AM General's exclusive distributor to sell military vehicles to the SDN.

10. Roberto Cardini was and is Plaintiff's General Director, the person in charge.

11. During the course of its relationship with Plaintiff, AM General sold the vehicles to Plaintiff.

12. Title to the vehicles passed to Plaintiff.

13. Plaintiff then resold the vehicles to the SDN.

14. In regards to compensation, Plaintiff was not paid a commission by AM General.

15. Rather, it made its money by marking up the purchase price of the vehicles and then reselling them to the SDN at the marked-up price.

16. Beginning in 1995, Plaintiff's placement of vehicles with the SDN severely diminished. Between 1995 and 2000, Plaintiff sold only 46 vehicles to the SDN.

17. AM General's relationship with Plaintiff was documented through a contract entitled Exclusive Distributor Agreement. These contracts were for a term of two years.

18.   During the 1990s, when an agreement expired, the parties executed a new one.

19.   The last such agreement executed was dated April 1, 1998, and it expired upon its terms on or about April 1, 2000.

20.   After that agreement expired, AM General did not send a new agreement for execution to Plaintiff.

21.   In April, 2000, a disagreement arose between Plaintiff and AM General in regard to the delivery of spare parts to the SDN.

22.   AM General provided Plaintiff with remanufactured transmissions for resale to the SDN whereas Plaintiff contended that according to its contract with the SDN it was to provide new transmissions.

23.   AM General instructed Plaintiff to return the disputed transmissions and other parts and Plaintiff would be issued a credit.

24.   At that time, Greg Daniels of AM General criticized Plaintiff's recent work performance.

25.   In response, Plaintiff rebuked AM General in a letter sent a few days later that included language such as "[p]eople in glass house[sic] should not throw stones." Plaintiff also detailed a list of complaints that it had with AM General's course of conduct.

26.   After that time, AM General gave Plaintiff only limited authority to act on its behalf.  For example, while it did not

renew the representation agreement, during the summer and fall of 2000, AM General issued vehicle quotes to Plaintiff so that it in turn could quote the sale of these vehicles to the SDN.  Each quote was for a limited period of time, *e.g.*, the vehicle quote dated September 11, 2000, expired on October 31, 2000.  On October 19, 2000, the vehicle quote was extended to February 28, 2001.

27.  After Plaintiff would receive a quote from AM General, it would provide a similar quote to the SDN.

28.  At no point, however, did Plaintiff enter into a contract with the SDN for the sale of any vehicles in 2000 or 2001.

29.  In addition to the vehicle quotes, on September 29, 2000, AM General authorized Plaintiff to represent AM General to the SDN. This authorization was in regards only to a proposal dealing with spare parts.

30.  Typically, when Plaintiff made a proposal to the SDN for the sale of vehicles, it also made a corollary proposal for the sale of spare parts.

31.  Around this time Cardini heard rumors that the SDN was alleging improprieties against Plaintiff.  He had not heard any similar allegations voiced against AM General.  At one point Cardini drafted a letter to AM General putting them on notice of these alleged improprieties, but did not include that language in the letter he actually sent to them.

32.  On February 28, 2001, the last of the vehicle quotes made by AM General to Plaintiff expired.

33.  Plaintiff had requested at least one extension of this quote, which was granted.  Plaintiff requested another extension, but AM General refused to grant such an extension.

34.  As of March 1, 2001, there were no outstanding proposals from AM General to Plaintiff.

35.  Neither was there a written and signed representation agreement between the parties.

36.  AM General severed its relationship with Plaintiff in a letter dated March 2, 2001.

37.  Because the SDN still wanted to purchase the vehicles, it requested AM General to sell the vehicles directly to it.  However, because of Mexican law, such a direct sale was not possible.

38.  In April, 2001, the SDN suggested that AM General retain Scorpion as its distributor for the sale.  AM General did so and, in May, 2001, sold the vehicles in question to Scorpion, who in turn sold the vehicles to the SDN.

39.  Scorpion also became AM General's exclusive distributor for the SDN on May 1, 2001.

## Additional Findings of Fact

**From a preponderance of the evidence, the Court additionally finds as follows:**

6

40.   The HUMVEE military vehicles sold to the SDN by AM General through Plaintiff, which acted as its distributor, were all special order vehicles, not "shelf items."   Thus, Plaintiff negotiated with the SDN not only for the sales of military vehicles but also for the detailed specifications and options that the SDN wanted to have on particular types of vehicles.   Plaintiff then obtained from AM General proposals providing prices, terms, and conditions for sales of the vehicles in the configurations that Plaintiff had negotiated so that Plaintiff, in turn, could give its proposals to the SDN, with a markup on the prices in order to provide for its own commissions.

41.   In 1999 and 2000, the long term and mutually beneficial relationship between Plaintiff and Defendant AM General encountered tensions regarding several matters.   For instance, AM General delivered remanufactured transmissions for the SDN notwithstanding the fact that the contract was for the purchase and sale of all new parts.   Although this breach of the purchase agreement was the fault of AM General, it provoked customer dissatisfaction on the part of the SDN that was directed at Plaintiff.   Likewise, AM General was unable to provide to Plaintiff quotations for the sales of vehicles and parts as quickly as Plaintiff desired to have them to pursue its sales efforts with the SDN.   In addition, there were some missing parts problems, also attributable to AM General, for which Plaintiff received the brunt of criticism from the SDN.   On

7

the other hand, AM General was disappointed that Plaintiff had not recently consummated significant numbers of sales of the military vehicles to the SDN.

42.  When the most recent Distributorship Agreement between Plaintiff and AM General expired on April 1, 2000, AM General did not send to Plaintiff a new agreement to extend the distributorship for another two years.  At first, this was unremarkable because prior two-year renewals of the Distributorship Agreement had usually arrived late and were executed a few weeks after the prior agreement had expired.  Unbeknownst to Plaintiff, however, AM General this time did not intend to send to Plaintiff a renewal of the Distributorship Agreement.

43.  In the meanwhile, however, Plaintiff continued to pursue its efforts to sell AM General's military products to the SDN. Thus, Plaintiff, whose only business was to sell AM General's products in Mexico, continued to expend its resources to employ the services of representatives on site in Mexico City and, as well, its office with employees in Houston.  The principal sales efforts to the SDN were made by Plaintiff's General Director, Roberto Cardini, who traveled on a frequent basis to Mexico City to pursue and to oversee Plaintiff's sales efforts at several levels within the SDN.

44.  Cardini periodically informed AM General of his and Plaintiff's ongoing sales efforts with the SDN.  In turn, AM

8

General, acting principally through its director of International Military Sales for Latin America, Greg Daniels, continued to press Cardini and Plaintiff to make more sales of AM General's products and to continue Plaintiff's sales efforts.  Cardini did so.

45.  In or about late Summer, 2000, Cardini's efforts had succeeded to the point that he requested AM General to provide price quotations on 65 M998A2 Series vehicles for the Government of Mexico, consisting of 32 cargo/troop carriers, 17 armament carriers, and 16 soft top ambulances.

46.  AM General, through David Mauk, Regional Manager for International Proposal and Contract Administration of AM General, furnished to Plaintiff the following quotation:

| Item | Model | Quantity | DAF Delivery Unit price (USD) |
|------|-------|----------|-------------------------------|
| 1 | M1097A2 Cargo/Troop Carrier Less Options | 32 | $ 64,102.00 |
| 2 | M1025A2 Armament Carrier Less Options | 17 | $ 74,102.00 |
| 3 | M1035A2 Soft Top Ambulances | 16 | $ 67,644.00 |

The unit price is quoted DAF delivery, Laredo, Texas. The prices quoted herein do not include federal excise tax, as these vehicles are destined for export, *nor do they include any commissions*, as the supplies are offered for sale directly to your company.  It is understood that the cost of freight, forwarding, insurance, and all other cost factors involved that are not specifically cited or expressed herein will be the responsibility of your company.

9

Payment terms are by an 100% Irrevocable Letter of Credit in favor of AM General Corporation, 105 North Niles Avenue, South Bend, Indiana 46617, issued and confirmed by a U.S. bank acceptable to AM General.   Final acceptance of the supplies will be at the DAF delivery point, Laredo, Texas, with the payment balance payable "at sight" upon presentation of required documents to the bank that issued and confirmed the payment letter of credit.

This quotation is valid until October 31, 2000.   We appreciate the opportunity to extend this offer and trust that it will receive favorable consideration.

Please direct any questions regarding this proposal to my attention.

Sincerely,

AM General Corporation

47.   Plaintiff continued to negotiate with the SDN to complete and consummate this multi-million dollar sales transaction and, in October, requested an extension of the quotation and certain revisions to exchange the alternator from a 200 amp to a 100 amp within the M1097A2 vehicles.   AM General on October 19, 2000, amended its quotation and extended its validity to February 28, 2001, as follows:

| Item | Model | Quantity | DAF Delivery Unit price (USD) |
|---|---|---|---|
| 1 | M1097A2 Cargo/Troop Carrier Less Options | 32 | $ 64,102.00 |
| 2 | M1025A2 Armament Carrier Less Options | 17 | $ 74,102.00 |
| 3 | M1035A2 Soft Top Ambulances | 16 | $ 67,644.00 |

10

The unit price is quoted DAF delivery, Laredo, Texas. The prices quoted herein do not include federal excise tax, as these vehicles are destined for export, *nor do they include any commissions*, as the supplies are offered for sale directly to your company. It is understood that the cost of freight, forwarding, insurance and all other cost factors involved that are not specifically cited or expressed herein will be the responsibility of your company.

Payment terms are by an 100% Irrevocable Letter of Credit in favor of AM General Corporation, 105 North Niles Avenue, South Bend, Indiana 46617, issued and confirmed by a U.S. bank acceptable to AM General.   Final acceptance of the supplies will be at the DAF delivery point, Laredo, Texas, with the payment balance payable "at sight" upon presentation of required documents to the bank that issued and confirmed the payment letter of credit.

This quotation is valid until February 28, 2001.   We appreciate the opportunity to extend this offer and trust that it will receive favorable consideration.

Please direct any questions regarding this proposal to my attention.

Sincerely,

AM GENERAL CORPORATION

48.   Plaintiff continued to work on the transaction, with Cardini traveling to Mexico City nearly every week and regularly informing AM General of his efforts to sell AM General's products to the Mexican Government.

49.   AM General at all times knew that Plaintiff was working to sell its HUMVEE vehicles without a distributorship contract but with the expectation of being paid for its services if the sale were consummated.

50.  At least until about mid-February, 2001, AM General continued to encourage Plaintiff and Cardini in their efforts to sell AM General's HUMVEE products to the SDN.

51.  In July, 2000, Vincente Fox had been elected President of Mexico.  (The Court takes judicial notice that Fox's election ended the Institutional Revolutionary Party's 71-years hold on the presidency.)  There was considerable uncertainty in the government about what changes in policy and personnel would occur after Fox's inauguration on December 1, 2000.  AM General's Edward Pomeroy advised his superior, Bruce Wisler, on December 4, 2000, that he had received information that "everyone in [the government's] procurement is keeping their heads down waiting to see who stays and who goes."  Plaintiff's Cardini was in Mexico City for the inauguration and associated festivities and, while there, met with several members of the incoming staff.  He reported these events to key personnel at AM General by letter dated December 12, 2000, and conveyed his opinion that the "future to sell military vehicles looks very bright."

52.  At some point Greg Daniels of AM General received an oral complaint regarding Plaintiff's representation of AM General in Mexico.  He made no effort to explain that a number of the irritants caused by irregularities in deliveries, missing parts, and the like, had been the fault of AM General, not Plaintiff.  Instead, Daniels requested that the complaint be delivered to him

12

in writing, and about mid-February, 2001, a letter was faxed to him from the Mexican Embassy in Washington, D.C., complaining about irregularities in the deliveries of certain items and a lack of sufficient technical assistance.  The correspondent requested replacement of Cardini as AM General's representative to the SDN.

53.  After receiving this letter, AM General concluded that the SDN would not purchase from Plaintiff the vehicles then being negotiated for sale and AM General decided to terminate its ongoing relations with Plaintiff.

54.  Although AM General made its decision to end its relationship with Plaintiff as early as mid-February, 2001, it did not communicate this decision to Plaintiff until March, 2001. Thus, throughout the remainder of February, AM General implicitly approved Plaintiff's continued efforts to finalize the SDN's purchase of AM General's military vehicles.

55.  On February 27, 2001, the SDN requested of Plaintiff an extension on the proposal it had received from Plaintiff for the purchase of 51 vehicles, consisting of 33 troop and cargo carriers, 17 armament carrier/patrol vehicles, and 1 ambulance.  Plaintiff's proposal to the SDN was due to expire February 28, 2001, since it was dependent upon AM General's corresponding proposal to Plaintiff that also expired February 28, 2001.

56.  Having anticipated the need for additional time to close the deal, Plaintiff by letter dated February 19, 2001, had already

13

requested of AM General an extension on the pricing, terms, and conditions for sale of 65 vehicles until April 15, 2001.

57. AM General, however, did not reply to Plaintiff's request, either verbally or in writing, and did not reveal to Plaintiff that AM General had unilaterally determined to end its relationship with Plaintiff and therefore desired for its proposal to Plaintiff to expire on February 28, 2001.

58. This was the first time in more than 12 years of their dealings that AM General had not granted to Plaintiff an extension of time on a proposal, either at the same price or in one instance at an adjusted price, that was requested by Plaintiff in order to close a deal that was being actively negotiated.

59. While making no response to Plaintiff's request for an extension of the proposal to April 15, 2001, and remaining silent on its intentions to end its relationship with Plaintiff, AM General sent matter-of-fact communications to Plaintiff by fax, on February 23, 2001, advising that AM General was preparing to ship directly to Plaintiff's offices certain parts items that the SDN had requested and, with a separate letter of the same date, delivered documents to Plaintiff to support Plaintiff's efforts to demonstrate to the SDN that the SDN had received full delivery of material that it had ordered in a previous contract. These routine communications gave no hint of what AM General intended to do less than a week later.

14

60.  AM General's Edward Pomeroy on February 26, 2001, sent a faxed communication directly to General Gustavo E. Gutierrez Martinez, who had taken over procurement in the new government, in which he proposed to meet personally with General Martinez and members of his staff at the SDN on Tuesday, March 6, 2001.

61.  On Friday, March 2, 2001, AM General's Bruce Wisler sent a letter by overnight delivery to Plaintiff's Roberto Cardini, stating that AM General had decided not to renew his Representation Agreement that had expired on April 1, 2000, and further denying his February 19, 2001, request for an extension of the vehicle price proposal that expired February 28, 2001.  Wisler declared it was AM General's intention not to extend these proposals or issue new proposals to him in the future, and that AM General intended to go "in a different direction relative to our marketing efforts to the government of Mexico in the future."

62.  Cardini was shocked to receive the foregoing letter at his home on the weekend and, on Monday, March 5, 2001, he placed a phone call to Wisler.  AM General was determined to proceed without Plaintiff and Cardini.   In fact, AM General's Greg Daniels and Edward Pomeroy arrived that same day in Mexico City to complete the deal that Plaintiff and Cardini had developed over a period of several months.

63.  By Thursday, March 8, 2001, AM General had delivered to the SDN virtually the identical proposal that had been negotiated

15

with the SDN by Plaintiff.  AM General's quotation given directly
to the SDN was as follows:

| Item | Model | Quantity | DAF Delivery Total Unit price (USD) |
|------|-------|----------|----------------------------------|
| 1 | M1097A2 Cargo/Troop | 33 | $ 74,733.00 |
| 2 | M1025A2 Armament Carrier | 17 | $ 85,681.00 |
| 3 | M1035A2 Soft Top Ambulance | 1 | $ 77,085.00 |

The unit price is quoted DAF delivery, Laredo, Texas.
The prices quoted herein do not include federal excise
tax, as these vehicles are destined for export.  It is
understood that the cost of freight, forwarding,
insurance and all other cost factors involved that are
not specifically cited or express herein will be the
responsibility of your government.

Payment terms are by an 100% Irrevocable Letter of Credit
in favor of AM General Corporation, 105 North Niles
Avenue, South Bend, Indiana 46617, issued and confirmed
by a U.S. bank acceptable to AM General.   Final
acceptance of the supplies will be at the DAF delivery
point, Laredo, Texas, with the payment balance payable
"at sight" upon presentation of required documents to the
bank that issued and confirmed the payment letter of
credit.

This quotation is valid until June 15, 2001.   We
appreciate the opportunity to extend this offer and trust
that it will receive favorable consideration.

Please direct any questions regarding this proposal to my
attention.

Sincerely,

AM General Corporation

64.  AM General's above quoted proposal to the SDN is almost verbatim to the one that Plaintiff had negotiated with the SDN. The notable difference in AM General's letter to the SDN, compared to its previous proposals to Plaintiff, is that in the letter to the SDN, AM General deleted the language contained in the unit price paragraph, "*nor do they* [the unit prices] *include any commissions*, as the supplies are offered for sale directly to your company." (Emphasis in original).  In other words, AM General at all times recognized that Plaintiff's efforts for the completion of a sale would be compensated not by commissions paid directly to Plaintiff by AM General, but instead, Plaintiff's commissions would be added on by Plaintiff in the two-step sale of vehicles by AM General to Plaintiff and simultaneous resale by Plaintiff to the SDN.  Thus, when AM General suddenly shifted to dealing directly with the SDN, it quoted to the SDN approximately the same unit prices as those that Plaintiff had quoted to the SDN after Plaintiff had included its markups.

65.  AM General soon completed the deal for sale of 51 vehicles on essentially the same pricing, terms, and conditions that had been negotiated by Plaintiff.  In fact, it was the exact deal that Plaintiff had successfully negotiated with the SDN except for a minor change to eliminate winches on the 33 cargo/troop vehicles.

66. AM General, however, did not have a Mexican subsidiary and did not wish to subject itself to the jurisdiction of Mexico. Before the transaction was finalized, therefore, AM General entered into a representation agreement with Scorpion Incorporated, which was situated in Mexico and had been recommended by the SDN, on terms that permitted Scorpion to receive a 4% commission on the sale of 51 vehicles that had been almost completely negotiated by Plaintiff.

67. The deal was quickly finalized in May, 2001, in the form of a two-step sale by AM General of the 51 vehicles to Scorpion and immediate resale by Scorpion to the SDN, for a total price of $3,999,851.00.

68. A $4 million sale of 51 HUMVEE military vehicles, consisting variously of cargo/troop vehicles, armament carriers, and an ambulance, all to be built to certain specifications and embodying numerous particular enhancements, could not have been negotiated to completion with the SDN--starting from scratch-- within so brief a period of time.

69. The essential sales efforts to bring about this sizeable and complex transaction for the sale of these AM General vehicles had been accomplished by Plaintiff over a period of at least eight months prior to March 1, 2001, and very little remained to be done to finalize this transaction on essentially the same pricing,

terms, and conditions that Plaintiff had successfully negotiated with the SDN.

70.  AM General agreed to sell the 51 vehicles through Scorpion to the SDN for $3,999,851.

71.  These were the same vehicles that AM General was willing to sell to Plaintiff for $3,442,744, for Plaintiff's immediate resale to the SDN.

72.  Plaintiff expected to earn what was in effect a commission in the amount of approximately $557,107 from its immediate resale of these vehicles to the SDN, and AM General was fully aware of Plaintiff's expectation to be compensated for its services in such manner.

73.  Since AM General eliminated Plaintiff from the transaction, Plaintiff was relieved from having to provide certain of the services and functions that Scorpion was later required to do and for which it was compensated by AM General with a 4% commission totaling approximately $158,000.

74.  The sum of $158,000 is the maximum value of the services that were not required of Plaintiff after February 28, 2001, to complete the sales transaction it had negotiated and to perform the follow-up services associated with deliveries of the vehicles to the SDN.

75.  The reasonable value of the services that were rendered by Plaintiff to AM General in bringing about the sale of the 51 HUMVEE vehicles is the difference between the compensation of

$557,107 that Plaintiff reasonably expected to receive from the sale and the sum of $158,000, the offset for services not required of Plaintiff after February 28, 2001.  This net sum is $399,107.

76.  AM General was fully aware at all times after Plaintiff's exclusive Distributor Agreement expired on March 31, 2000, that Plaintiff was actively engaged in significant and continuous efforts to sell to the SDN 65 of AM General's HUMVEE military vehicles, which the SDN later reduced to 51 in number, and that Plaintiff was doing so without any existing contract with AM General in anticipation of being compensated in the manner that previously had been the practice of the parties during the life of the Distributorship Agreement.

77.  AM General at all material times not only accepted the efforts of Plaintiff to sell AM General's military vehicles to the SDN but also actively encouraged Plaintiff to sell those vehicles up until February, 2001, when AM General decided to terminate its relationship with Plaintiff and to make a direct offer to the SDN to sell to it the same vehicles on essentially the same pricing, terms, and conditions that Plaintiff had already negotiated.  After engaging Scorpion for technical reasons, AM General closed the transaction without the presence of Plaintiff.

78.  Plaintiff during the preceding year had rendered valuable services to AM General to bring about the sale of 51 HUMVEE military vehicles for $3,999,851.

20

79. AM General at the very time it severed its relationship with Plaintiff and continuously thereafter, accepted, used, and enjoyed the services rendered by Plaintiff during the preceding year and shortly thereafter consummated the sale of 51 HUMVEE vehicles based upon the deal that had been negotiated by Plaintiff.

80. Plaintiff's services rendered to AM General in negotiating with the SDN during the months preceding March 1, 2001, to sell 51 of AM General's military vehicles, were rendered under circumstances that reasonably notified AM General that Plaintiff in performing the services at all times expected to be compensated if the sale were completed, which it was.

81. The reasonable value of the services that Plaintiff provided to AM General in bringing about its May, 2001, sale of 51 HUMVEE military vehicles is $399,107.

82. By January 1, 2002, all of the subject 51 military vehicles were to have been delivered to the purchaser by AM General and AM General was to have been paid in full for all 51 vehicles. Hence, by January 1, 2002, AM General had fully realized the economic benefit to it from its having accepted, used, and enjoyed the valuable services rendered to AM General by Plaintiff in connection with negotiating and bringing to near completion the sale of the 51 military vehicles.

83.  Plaintiff should have been paid for the reasonable value of the services it rendered to AM General in connection with the foregoing transaction no later than January 1, 2002.

84.  Plaintiff is entitled to recover from AM General pre-judgment interest on the quantum meruit sum of $399,107, from January 1, 2002, the date of its loss, to the date of judgment.

85.  Plaintiff is entitled to recover from AM General reasonable attorneys' fees and expenses incurred in connection with this action.

## Conclusions of Law

The Court makes the following conclusions of law:

1.   "Quantum meruit is an equitable theory which permits a 'right to recover . . . based upon a promise implied by law to pay for beneficial services rendered and knowingly accepted.'" Leasehold Expense Recovery, Inc. v. Mothers Work, Inc., 331 F.3d 452, 462 (5th Cir. 2003) (quoting Black Lake Pipe Line v. Union Constr. Co., Inc., 538 S.W.2d 80, 86 (Tex. 1976). See Heldenfels Bros., Inc. v. City of Corpus Christi, 832 S.W.2d 39, 41 (Tex. 1992).  "Recovery under quantum meruit is premised 'on the principle of equity that a party deserves to be paid for the services or materials he furnishes.  A person should be compensated for his efforts when an express contract does not provide recovery for the reasonable value of the services rendered and accepted.'"

22

Infra-Pak v. Carlson Stapler & Shippers Supply, Inc., 803 F.2d 862, 863, 866 (5th Cir. 1986) (quoting Wood v. Texas Farmers Ins. Co., 593 S.W.2d 777, 781 (Tex. Civ. App. 1979, no writ) (citation omitted)).

2.   The facts found in this case are even more compelling than those in Infra-Pak, 803 F.2d 862, in which the Fifth Circuit upheld a quantum meruit recovery by a plaintiff for services rendered that the Court found were not covered by its existing distributorship agreement with the defendant.  Here, in contrast, there was no distributorship agreement in effect between Plaintiff and AM General at any time after March 31, 2000, after which date Plaintiff rendered the bulk of its services to AM General that ultimately led to AM General's sale of 51 HUMVEE vehicles.  Thus, there was no express contract between Plaintiff and AM General that could arguably be invoked to preclude a recovery by Plaintiff in quantum meruit.

3.   To recover under the doctrine of quantum meruit in Texas, Plaintiff must prove that (1) valuable services were rendered to Defendant; (2) Defendant accepted, used, and enjoyed the services; (3) under circumstances that reasonably notified Defendant that Plaintiff, in performing such services, expected to be compensated. See Kona Tech. Corp. v. Southern Pac. Transp. Co., 225 F.3d 595, 606 (5th Cir. 2000) (citing Bashara v. Baptist Memorial Hosp. Sys., 685 S.W.2d 307, 310 (Tex. 1985)).  See also Vortt Exploration Co.,

Inc. v. Chevron U.S.A., Inc., 787 S.W.2d 942, 944 (Tex. 1990).
Under Texas law, "[t]he expected payment does not have to be
monetary; it may be any form of compensation." *See* id. at 945.
*See also* Infra-Pak, 803 F.2d at 863, 866.

4.   "Under Texas law, quantum meruit awards service
provider's [sic] the reasonable value of services rendered unless
the parties already contracted for the services." Jhaver v. Zapata
Off-Shore Co., 903 F.2d 381, 384 (5th Cir. 1990). *See* Infra-Pak,
803 F.2d at 866 ("The measure of quantum meruit recovery is the
reasonable value of the services rendered"). *See also* Leasehold
Expense Recovery, Inc. v. Mothers Work, Inc., 331 F.3d 452, 462
(5th Cir. 2003); Bank One, Tex., N.A. v. F.D.I.C., 16 F. Supp. 2d
698, 714 n.18 (N.D. Tex. 1998).

5.   "A party who recovers in quantum meruit is also entitled
to recover attorney's fees." Caldwell & Hurst v. Myers, 714 S.W.2d
63, 65 (Tex. App.--Hous. [14 Dist.] 1986, writ ref'd n.r.e.). *See*
TEX. CIV. PRAC. & REM. CODE § 38.001 (allowing recovery of reasonable
attorney's fees from a corporation, in addition to the amount of a
valid claim and costs, if the claim is for, *inter alia*, rendered
services).

6.   A party who recovers in quantum meruit may be awarded
prejudgment interest commencing from the date of loss.  U.S. v.
Con-Real Support Group, Inc., 950 F.2d 284, 289 (5th Cir. 1992)
(citing Black Lake Pipe Line Co. v. Union Constr. Co., 538 S.W.2d

24

80, 95-96 (Tex. 1976), *overruled on other grounds*, <u>Sterner v. Marathon Oil Co.</u>, 767 S.W.2d 686 (Tex. 1989); <u>Davidson v. Clearman</u>, 391 S.W.2d 48, 52 (Tex. 1965).

7.   Plaintiff is entitled to recover from AM General for services it rendered to AM General in quantum meruit in the amount of $399,107, plus prejudgment interest on such sum, plus reasonable attorneys' fees and expenses.

8.   If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

The Clerk shall notify all parties and provide them with a true copy of these Findings of Fact and Conclusions of Law.

SIGNED at Houston, Texas, on this 12th day of April, 2006.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE